**FILED**

NOT FOR PUBLICATION

**NOV 22 2006**

RECEIVED JUN 04 2007

CLERK, U.S. ... ANCHORAGE, ALASKA

**CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| **NANCY ANN RANDALL, as mother of Jazmyn Lee Vent, and as personal representative of the estate of Corwin Lee Vent; JAZMYN LEE VENT; CORWIN LEE VENT, Estate of,** | No. 05-35112<br><br>D.C. No. CV-03-00001-F-RRB |
| Plaintiffs - Appellants, | **MEMORANDUM** * |
| v. | |
| **PERRY WILLIAMSON,** | |
| Defendant - Appellee. | |

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, District Judge, Presiding

Argued and Submitted July 27, 2006
Anchorage, Alaska

Before:     **KOZINSKI, BERZON** and **TALLMAN**, Circuit Judges.

Counsel for Officer Williamson conceded at oral argument that Corwin

Vent did not pose a sufficient threat to justify the use of deadly force against him

---

*       This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3.

page 2

prior to his arrival at the roadblock.[1]  If the use of deadly force against Vent was justified, then, it was on account of the threat Vent posed to Officer Williamson or bystanders once he arrived there.

We have two inconsistent accounts of what happened at that point. According to Williamson and a bystander, the van struck Williamson and did not stop until after Williamson shot Vent.  According to plaintiff, Vent had brought the van to a complete stop by the time Williamson fired.[2]

---

[1]  In response to the question, "at any point during this trip could [the police] have simply shot [Vent] because he was driving recklessly," defense counsel answered "no."

[2]  The dissent states as a fact that Vent used the van as a "deadly weapon" by failing to stop before Williamson was hit.  Dissent at 4.  In so doing, the dissent accepts as true the accounts of Williamson and a bystander, Jennifer Grundy.  But the record also contains testimony from Nancy Randall, a passenger in the van, who clearly testified to the contrary:

Q:    Did the van make contact with the police officer?

A:    No.

. . . .

Q:    Can you tell me how [Williamson's] handprint got on the hood of the van?

A:    It probably got there after he shot him, because he—we—we didn't touch the officer, so I—I would imagine that it got there after, because the van continued to roll after he shot him.

(continued...)

Under <u>Tennessee</u> v. <u>Garner</u>, 471 U.S. 1 (1985), deadly force violates the

Fourth Amendment where "the suspect poses no immediate threat to the officer

and no threat to others." <u>Id.</u> at 11. If the van had come to a complete stop, as

---

[2](...continued)

. . . .

Q:    . . . [S]o, what, your testimony is that the print on the front here would
      have been the—would have been placed there after the shots were
      fired?

A:    Yeah. The officer, he was—I mean, he—he walked up in front of the
      van, and told them to stop, and he had no intention of running him
      over or anything.

Q:    And how do you know that?

A:    Because he stopped. So I—so I believe he didn't have any intention
      at all to run over anyone.

Q:    So your testimony today is that the van had completely stopped, was
      not moving forward when the officer fired the shots?

A:    Yeah. And that was my testimony back then, too.

To the extent Randall may have given a somewhat different account
immediately after the incident (and it's not clear she did), resolving any
inconsistencies is a matter for the trier of fact. In re Zilog, Inc., 450 F.3d 996,
1002 n.6 (9th Cir. 2006). Viewing the record in the light most favorable to
plaintiff—as we must at this stage—a reasonable jury could piece together the
following sequence of events: Vent stopped the van as directed by Williamson;
Williamson then fired, hitting Vent and causing his foot to slip off the brake; the
van then started rolling forward, making contact with the officer. Whether this is a
true account of what happened can only be resolved at trial.

page 4

plaintiff contends, there was no cause to believe that Vent was a danger to

Williamson or to anyone else when Williamson shot him.  Unlike the plaintiff in

Brosseau v. Haugen, 543 U.S. 194 (2004) (per curiam), Vent was not suspected of

a crime of violence.  At the time Williamson fired, the officer knew only that Vent

was suspected of traffic violations and had failed to pull over when ordered to do

so earlier that evening.[3]  And, assuming that Vent had stopped the van, he was not

attempting to flee the scene—unlike the suspect in Brosseau.  Perhaps the record

at trial will reveal more, in which case Williamson may renew his claim of

qualified immunity.  But at this stage of the proceedings, defendant has shown

insufficient undisputed facts to justify the use of deadly force under Garner.

We take seriously the Court's statement in Saucier v. Katz, 533 U.S. 194,

205 (2001), that a material factual dispute should not always defeat summary

judgment in qualified immunity cases.  What the Court was saying, though, is that

even if there is a disputed issue of material fact, summary judgment may

nonetheless be appropriate on qualified immunity grounds—if the facts, taken in a

light most favorable to the injured party, do not show a constitutional violation.

---

[3] Contrary to the dissent's suggestion, dissent at 2 n.1, there is a dispute as to whether Vent committed third degree assault against Officer Williamson.  If Vent obeyed the Officer's order and brought the van to a stop, he would not have been guilty of assault.

Saucier says nothing to suggest that we can affirm summary judgment where there are material disputed facts, and where the injured party's version of those facts show a rights violation that would be clear to a reasonable officer. Post-Saucier, we've held to the contrary. See Martinez v. Stanford, 323 F.3d 1178, 1182 (9th Cir. 2003). The dissent dismisses the disputed factual issue, but if we assume that Vent had brought the van to a complete stop, what we are left with is a police officer who shot and killed a motorist for nothing more than traffic violations—violations that the officer's own lawyer admits were not serious enough to justify the use of deadly force. Under these circumstances, Officer Williamson's conduct was not justified under Tennessee v. Garner, and no reasonable officer could have thought otherwise. Saucier, 533 U.S. at 202.

The dissent also seems to suggest that it doesn't matter whether Vent stopped because his assault was complete even before he struck Officer Williamson. Dissent at 5. Presumably this is based on a theory that the officer could reasonably believe that Vent wouldn't stop. But this is an intensely factual issue that cannot be resolved at summary judgement. We do know that the van approached Williamson at a very low rate of speed and that Williamson suffered at most scrapes and bruises when it eventually struck him. We must also assume, for the reasons explained above, that the van did stop before reaching Williamson.

page 6

This sequence of events hardly establishes that a reasonable person would have

perceived that Vent used his van as a battering ram.  Summary judgment was thus

inappropriate.

**REVERSED.**

**FILED**

Randall v. Williamson, No. 05-35112

NOV 22 2006

CATHY A. CATTERSON, CLERK
U.S. COURT OF APPEALS

TALLMAN, Circuit Judge, dissenting:

"Because 'police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,' the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier v. Katz*, 533 U.S. 194, 205 (2001) (internal citations omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)). We must judge "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," even if the force used "may later seem unnecessary in the peace of a judge's chambers." *Johnson v. County of L.A.*, 340 F.3d 787, 792 (9th Cir. 2003) (internal quotations and citations omitted).

The courts have now had more than six years to decide whether a police officer, with only seconds to decide whether to employ deadly force, is entitled to qualified immunity. Assuming a constitutional violation occurred—though I question whether Officer Williamson used excessive force under the circumstances alleged when he stood his ground in the path of the oncoming car to

1

effect the arrest of a dangerous felon[1]—Officer Williamson still acted reasonably and is entitled to the protection of the law. Therefore, I respectfully dissent.

The district court properly determined that *Brosseau v. Haugen*, 543 U.S. 194 (2004), controls this case. It reaffirmed the two-step process announced in *Saucier*. *Saucier* instructs lower courts to initially consider whether "the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. If the plaintiff establishes the officer violated his constitutional rights, a court next considers whether "the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001). Whether it would be clear to a reasonable officer that he acted unlawfully in the situation determines the latter qualified immunity inquiry—namely, whether the right is "clearly established." *Brosseau*, 543 U.S. at 199. Courts must undertake the qualified immunity inquiry "in light of the

---

[1] No one disputes that Vent violated A.S. 28.35.182(a) by failing to stop at the direction of a peace officer in the first degree, a Class "C" felony, *id.* § (e). He violated that felony statute for more than forty minutes. Labeling his conduct "mere traffic violations" seriously misstates what occurred, no matter how charitably one views the uncontested factual record. Nor can the majority seriously dispute that Vent violated A.S. 11.41.220(a)(1)(A), assault in the third degree, a Class "C" felony, when he kept moving towards and eventually struck Officer Williamson with his van.

2

specific context of the case, not as a broad general proposition." *Id.* at 198; *see also Wilson v. Layne*, 526 U.S. 603, 615 (1999) ("[A]s we explained in *Anderson*, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."). The majority dismisses this nuance.

Neither Supreme Court nor circuit precedent would have put a reasonable officer in Officer Williamson's position on notice that using deadly force to stop Vent from committing further dangerous crimes would violate Vent's Fourth Amendment rights. We must view what happened from the objective perspective of a reasonable police officer facing the specific uncontested events that took place on the afternoon of October 29, 2000. *Johnson*, 340 F.3d at 792. First, Vent erratically tore through the streets of Fairbanks as he fled from several officers, including Officer Williamson who chased Vent earlier in the pursuit, in what became almost an hour-long chase. He recklessly wove through traffic, sped through busy parking lots full of Sunday shoppers, and ran at least seven red lights and three stop signs.

Then, Vent drove through two rows of stopped cars, scraping at least one on the way, to avoid stopping at Officer Williamson's solitary road block, despite Officer Williamson's obvious demands that he do so. That he endangered other

3

citizens and pursuing officers by his behavior cannot seriously be questioned. And, finally, Vent employed his van as a deadly weapon when he assaulted and struck Officer Williamson on his shins with the van because the officer would not retreat from discharging his duty to arrest the felon.[2] I do not understand why my colleagues now suggest that Vent's behavior during the chase did not pose a grave risk of harm to the citizens of Fairbanks or the officers attempting to apprehend him. I am not satisfied that counsel's answer to Judge Berzon's question at oral argument correctly states the law on deadly force as it applies to the uncontested facts of this case. Nor does counsel's answer resolve applying qualified immunity at the point in the chase where using deadly force was in fact permissible.

---

[2] While the parties dispute whether Vent completely stopped the van before Officer Williamson fired the mortal shot, assuming Vent did, it is undisputed that Vent's van touched Officer Williamson's shins, and that at some point the hood of the van touched Officer Williamson's left hand and forearm at about the time he fired his weapon. Officer Williamson and an eye witness, Jennifer Grundy, testified at deposition about the contact between Vent's van and Officer Williamson. Officer Williamson testified: "Well, I felt my feet sliding as the van pushed against my shins, and at that instant is when I shot." Grundy testified: "He pulled–he drew out his gun, and that exact same time, the front end of the van hit him, and his hand went–his–I believe it was his left hand, went up onto the–the van, and I thought I was going to witness him being run over." Vent's girlfriend does not dispute that contact occurred. Today, she insists the van stopped before Officer Williamson fired the fatal shot. But immediately following the incident, when she had no time to reflect on the ramifications of her statements, she stated "[w]ell maybe [the van went forward], I don't know, but then I know he, I know that the intention was to stop, though."

4

Vent completed the assault long before he stopped the van. *See* A.S.

11.41.220(a)(1)(A) (stating that a person commits assault in the third degree if he

recklessly places another person in fear of imminent serious injury by means of a

dangerous instrument); *see also Cathey v. State of Alaska*, 60 P.3d 192, 197

(Alaska Ct. App. 2002) (explaining that a person is "placed in fear of imminent

injury" as used in the third-degree assault statute "if the person reasonably

perceives or understands a threat of imminent injury"). Officer Williamson could

reasonably apprehend a risk of harm based on what he knew and what he could

see. What he saw was Vent continually moving towards him while Vent hunched

low behind the steering wheel to protect himself with the van's engine block. This

was because Officer Williamson had already drawn his weapon to reinforce his

raised hand signaling Vent to stop. A reasonable officer could conclude from

these observations that Vent had no intent to stop, thus justifying a reasonable

belief that a vehicular assault was imminent and justifying the use of deadly force.[3]

---

[3] While unknown to Officer Williamson, Vent, driving under the influence
of alcohol and drugs, and without a driver's license, was fleeing to avoid arrest on
two outstanding warrants. Vent's extensive criminal history, including a prior
threat to harm an officer's family that resulted in a state Trooper placing an officer
safety alert into the Alaska police computer network, evidences not only Vent's
disregard for Officer Williamson's and Fairbanks citizens' safety, but also his
intent to breach Officer Williamson's roadblock. Randall admitted at deposition
that Vent had no intention of stopping during the pursuit. She testified: "He's got
a warrant so he didn't want to pull over. . . he's got a felony warrant, you know,

5

While I agree that the parties contest whether Vent completely stopped the van before Officer Williamson fired the fatal shot, it is nevertheless immaterial to the qualified immunity analysis. The majority fails to identify any case, as the Supreme Court requires, demonstrating a clearly established rule prohibiting Officer Williamson from responding with deadly force to protect himself and others from injury. And, the rule certainly does not require that he wait until the van hits him before he may fire. Even if Officer Williamson fired after Vent stopped the van, qualified immunity protects him from his mistake. *See Saucier*, 533 U.S. at 205 ("An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.").

Nor does the majority adequately distinguish *Brosseau*. In *Brosseau*, the Supreme Court held that this court mistakenly found fair warning under *Garner*—the case the majority relies upon once again—because it is "cast at a high level of generality." *Brosseau*, 543 U.S. at 199. After examining relevant case law, the Court held that using deadly force against a suspect avoiding capture through vehicular flight falls within the "'hazy border between excessive and

---

and he just didn't want to go to jail so he didn't want to pull over . . . ."

6

acceptable force.'" *Brosseau*, 543 U.S. at 201 (quoting *Saucier*, 533 U.S. at 206). Indeed, this case involves more egregious facts than in *Brosseau*.

There, to avoid arrest on a narcotics warrant and other felony charges, the plaintiff fled on foot before jumping into the driver's side of his jeep parked in the driveway at his mother's house. *Brosseau*, 543 U.S. at 196. The defendant officer arrived on foot at the jeep, pointed her gun at the plaintiff, and ordered him to get out of the vehicle. *Id.* at 196-97. After repeating her demands and shattering the driver's side window, the officer struck plaintiff on the head with the barrel and butt of her gun. *Id.* As the jeep started or shortly after it began to move—a disputed factual issue—the officer fired one shot through the rear driver's side window. *Id.* No chase ensued at any time.

While Randall attempts to rely on one pre-*Saucier* case to establish Vent's Fourth Amendment rights, *Acosta v. City & County of S.F.*, 83 F.3d 1143 (9th Cir. 1996), her efforts fail. *Acosta* employed the Ninth Circuit conflated analysis to qualified immunity later discredited in *Saucier*. *Acosta* also presents a different factual setting. It resembles this case only because the officer in *Acosta* fired shots into a car. *Id.* at 1144. In *Acosta*, the officer chased two purse snatchers on foot and, as the decedent attempted to pick up the fleeing purse snatchers in a vehicle, the officer, standing close to the side of the car, fired two shots into the car. *Id.* at

7

1146. Apart from the fact that a strong armed robbery had just occurred, no lengthy and dangerous police chase preceded the deadly force. And the officer was then in no personal danger as was Officer Williamson.

The majority claims that the trier of fact must resolve Randall's inconsistent statements about whether the van completely stopped before Williamson fired the fatal shot. That Randall's account today differs markedly not only from her earlier account, but also from Officer Williamson's and Jennifer Grundy's account, is no different from the situation in *Brosseau* where the defendant officer and the plaintiff had differing accounts on precisely when the officer shot at the plaintiff, before or after the jeep began to move, *Brosseau* 543 U.S. at 196-97. Yet in *Brosseau*, the Supreme Court deemed summary judgment granting qualified immunity proper because the cases governing the use of deadly force on a suspect avoiding capture through vehicular flight "by no means clearly establish[ed] that Brosseau's conduct violated the Fourth Amendment." *Brosseau*, 543 U.S. at 201. This case is no different from *Brosseau*.

By framing this case as one raising questions of fact on whether or not Vent actually stopped the van to justify sending the case to the jury, my colleagues make the same mistake we made in *Saucier*. As the Supreme Court stated then:

> The approach the Court of Appeals adopted—to deny summary
> judgment any time a material issue of fact remains on the excessive

8

> force claim—could undermine the goal of qualified immunity to
> 'avoid excessive disruption of government and permit the resolution
> of many insubstantial claims on summary judgment.' If the law did
> not put the officer on notice that his conduct would be clearly
> unlawful, summary judgment based on qualified immunity is
> appropriate.

*Saucier*, 533 U.S. at 202 (internal citation omitted) (quoting *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982)). The majority's attempt to compare this case to

*Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003), fails because there, the

law regarding a prison guard's use of excessive force was clearly established at the

time of the incident, *id.* at 1183-84, whereas here, the law is not clearly

established.

In sum, Officer Williamson reasonably believed Vent posed a significant

threat of great bodily injury or harm to himself and others, and no case with the

requisite level of specificity establishes otherwise. The law permits an officer to

employ deadly force to preserve public safety. *See Brosseau*, 543 U.S. at 197-98.

Accordingly, I would AFFIRM the district court's order granting qualified

immunity to Officer Williamson.

I respectfully dissent.